# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | Michael T. Mason |
|---|---|---|---|
| **CASE NUMBER** | 02 C 5925 | **DATE** | 6/20/2003 |
| **CASE TITLE** | MB Financial vs. MB Real Estate | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendant's motion to strike portions of plaintiff's proposed findings of fact and post-hearing brief [76-1] is granted. Defendant's request of attorney's fees connected with bringing this motion is denied. REPORT AND RECOMMENDATION is hereby submitted to Judge Gettleman recommending that the District Court DENY plaintiff's motion for preliminary injunction [12-1]. Specific written objections to this report and recommendation may be served and filed within 10 business days from the date that this order is served. Fed. R. Civ. P. 72(a). Failure to file objections with the District Court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the report and recommendation. *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | **2** number of notices |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | JUN 2 3 2003 date docketed |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | docketing deputy initials |
| ✓ | Copy to judge/magistrate judge. | |
| KF | courtroom deputy's initials | 6/20/2003 date mailed notice |

CLERK U.S. DISTRICT COURT

03 JUN 20 AM 10: 54

FILED-ED 10

Date/time received in central Clerk's Office

KF mailing deputy initials

Document Number 81

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **MB FINANCIAL BANK, N.A.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 02 C 5925** |
| **vs.** | ) | |
| | ) | |
| **MB REAL ESTATE SERVICES, L.L.C.,** | ) | **Judge Robert W. Gettleman** |
| | ) | |
| | ) | **Magistrate Michael T. Mason** |
| **Defendant.** | ) | |

### REPORT AND RECOMMENDATION

Michael T. Mason, United States Magistrate Judge:

Plaintiff, MB Financial Bank, N.A. ("Bank") has filed a motion for a preliminary injunction against Defendant, MB Real Estate Services, L.L.C. ("Real Estate"), alleging trademark infringement of several trademarks under the Lanham Act.[1] Bank asks that Real Estate be enjoined from using its allegedly confusingly similar marks until the completion of this case. The District Court referred the matter to us to conduct a hearing on the motion, which was held on January 27-30, 2003. For the reasons stated herein, we recommend that the District Court DENY the motion. In rendering this decision, the Court has considered the testimony of the witnesses, the documents admitted into evidence, the pre-hearing and post-hearing arguments and briefs of the parties, and the relevant case law. Pursuant to Fed. R. Civ. P. 52, we make the following findings of fact and conclusions of law.

**DOCKETED**

JUN 2 3 2003

---

[1] Bank also accuses Real Estate of unfair competition under the Lanham Act and common law, and deceptive business practices and deceptive trade practices under Illinois law.



## FACTS

Several marks are at issue in this suit. A careful review of the histories, asserted trademarks, and business activities of the parties in this case is necessary to determine which marks are pertinent to the current motion and suit.

## I. Bank's History, Asserted Trademarks, and Business Activities

### *Bank's history*

A brief history of how Bank came to be is helpful here. In June 1997, Bank's predecessor, a bank by the name of Manufacturers Bank, began using the word mark "MB" and a stylized mark incorporating the capital letters "MB" in commerce. On February 26, 1999, Manufacturers Bank's parent company changed its name to MB Financial, Inc. On April 20, 2001, MB Financial, Inc. announced its plans to merge with an entity called Mid-City Financial Corp. Mid-City Financial Corp. was the parent company of Mid-City National Bank of Chicago, First National Bank of Elmhurst, and First National Bank of Morton Grove. These two parent company banks, MB Financial, Inc. and Mid-City Financial Corp., merged into a new entity in November 2001 under the name of MB Mid City. MB Mid City subsequently changed its name to MB Financial, Inc. MB Financial, Inc. (the holding company of Manufacturers Bank) retained its name throughout the merger.

Sometime prior to November 14, 2001, the subsidiaries of MB Financial, Inc. and Mid-City Financial Corp. merged. Specifically, Manufacturers Bank, First National Bank of Elmhurst and First National Bank of Morton Grove merged into The Mid-City National Bank of Chicago, resulting in a new bank named The Mid-City National Bank of Chicago.

Before this merger took place, a committee consisting of representatives from both the old Manufacturers Bank and the old Mid-City National Bank of Chicago was formed to make recommendations to the board of directors as to what new name to select for the Chicago area bank resulting from the merger. Monigle, a company with experience in the area of name selection, was hired to conduct a consumer survey to gauge the strength of the old banks' names, Manufacturers Bank and Mid-City National Bank of Chicago, and to make recommendations regarding the name for the new Chicago bank resulting from the merger. Monigle determined that neither of the old banks' names were particularly strong in the Chicago market and recommended that a new name be selected. Monigle suggested that the bank avoid using initials in its new name, opining that initials are hard to remember and could be the "quickest route to anonymity." Subsequently, Monigle sent a memorandum to Manufacturers Bank Vice President Jeff Husserl enclosing a URL search report which identified numerous registered Internet sites using the letters "MB," including nine of which were related to financial services. The report identified registrations such as www.mbbank.com.

Ultimately, however, in the Fall of 2001, it was decided that the new name for the bank resulting from the merger would be "MB Financial Bank, N.A." (the plaintiff in this case). Bank cited several reasons for choosing this name despite Monigle's suggestion otherwise. Among its reasons were that customers had already begun to refer to Manufacturers Bank as "MB," and that Bank wanted to carry over the goodwill that the name "MB" had established with the bank's customers.

### *Bank's asserted trademarks*

Bank contends that it owns a variety of protectible marks which incorporate the letters "MB." It asserts that it has superior rights in the "MB" word mark and the stylized logo incorporating the capital letters MB (the "original MB logo"), which were first used by Manufacturers Bank in June 1997. It asserts that it also owns the "MB FINANCIAL" word mark, which was first used by Manufacturers Bank in March 1999. And, finally, it asserts that it owns the "MB Financial Bank" word mark, as well as an updated "mb" logo and "mb financial bank" logo, all of which were first used by Bank in approximately October 2001. Thus, Bank relies on six possible protectible marks that incorporate the letters "MB." We will address each of these word marks and logos in turn.

### *The original MB logo and "MB" word mark*

In June 1997, Manufacturers Bank began using the original MB logo and "MB" word mark in commerce. The original MB logo is depicted as a capitalized "M" aligned with a capitalized "B," in the color white, and set in a maroon-colored rectangular shaped box.

Manufacturers Bank filed a trademark registration application for the "MB" word mark in January 1997, but the application was subsequently abandoned. Manufacturers Bank filed a trademark registration application for the original MB logo in December 1999. On October 10, 2000, the U.S. Patent and Trademark Office ("PTO") issued Manufacturers Bank federal Trademark Registration No. 2,393,663 ("the '663 mark") for the original MB logo for use for "banking services." Bank asserts that it owns these marks, as successor to Manufacturers Bank.

*The "MB FINANCIAL" word mark*

In March 1999, Manufacturers Bank began using the "MB FINANCIAL" word mark in connection with its banking services.

On July 3, 2000, Manufacturers Bank filed a trademark registration application for the word mark "MB FINANCIAL." On July 10, 2001, the U.S. PTO issued Bank federal Trademark Registration No. 2,467,873 ("the '873 mark") for the "MB FINANCIAL" word mark for use for "banking services."

*The new word mark and logos*

In approximately October 2001, Bank began using: (1) the "MB Financial Bank" word mark, (2) a new "mb" logo, and (3) an "mb financial bank" logo. The new "mb" logo consists of the letters "mb" in white, lower-case font, encased in a red square. The "mb financial bank" logo consists of the same "mb" logo just described, with the words "financial bank" alongside the "mb," in gray, lower-case lettering.

In February 2002, Bank filed a trademark registration application for these three marks. The applications identified the listing of goods and/or services as "banking services, including commercial and consumer lending services, real estate leasing services and cash management services." The U.S. PTO refused all three of Bank's applications in the Summer of 2002. The applications were refused, in part, because of a prior registered stylized mark by MB Valuation Services, Inc. which used the letters "MB" for, *inter alia,* real estate brokerage services.

*Bank's use of the six logos and word marks*

Bank adopted its newest three marks at the end of 2001, around the same time the merger resulting in Bank took place. In conjunction with the merger and name

change, Bank began heavily promoting its new logos and work mark. Specifically, Bank began using the marks on company letterhead, brochures, premium items, monthly statements, and on signs at branch locations. In addition, in November 2001, Bank sent a "merger book" to a large number of customers introducing the 2001 word mark and logos. And, in December 2001, Bank further promoted its new logos through an expensive media campaign.

Around the same time, Bank discontinued active use of the original MB logo. For instance, the original MB logo no longer appeared on signage outside existing Bank branches. And, all ATM cards, debit cards, checks and monthly statements issued by Bank since the merger display the MB Financial Bank name and logos instead of the original MB logo. Bank took other steps to diminish the use of the original MB logo, as well. Specifically, it placed on its intranet a document entitled "Frequently Asked Questions" to address Bank's new name. Among the questions asked and answered was the following:

Q. Why was the color red selected [for the new MB logo]?

A. Red is one of the most visible colors in the color spectrum. The red chosen has an orange tint and *is markedly different than the maroon color that Manufacturers Bank currently uses. We were unhappy with the energy and vibrancy conveyed by Manufacturer's current dark red color. From a design perspective, the new red is significantly different*. The color will be vibrant on signage, stationary, billboards and a multitude of applications. We studied other possible colors including green, blue and orange. Red was more progressive and noticeable and worked in concert with our new design.

(Emphasis added.) In addition, Bank included a page on its intranet entitled "Out With The Old And In With The New," which explained that new "MB Financial Bank" signage

-6-

was being installed and included a photo of an old "Manufacturers Bank" sign being removed. The intranet instructed employees to shred or remove all materials (stationery, fax forms, business cards, etc.) with the old bank names on it and refrain from wearing items containing the old logo to work, among other things. Then, in November 2001, Bank sent a mailing to its customers entitled "A New Era in Banking!" which introduced customers to the new name and new company. In addition, a manual adopted by Manufacturers Bank which provided policies and guidelines for maintaining the protectibility of the original MB logo, among other things, ceased to be "operative" in November 2001. Finally, Bank's parent's 2001 Annual Report reported "embark[ing] upon our single, most aggressive corporate and marketing communications program ever in the Chicago market ... to etch the MB Financial Bank branch name into the minds of the market place."

Although discontinued from active use, the original MB logo is not completely out of use. First, the logo appears on all ATM cards, debit cards and checks that were issued prior to the adoption of the new logos. Bank's customers continue to use these items, and Bank has no plans to recall them. Instead, as those ATM and debit cards and checks are lost or used up, replacement cards and checks with the new logo will be distributed in their place. Because these old ATM cards, debit cards and checks have no expiration date, it is not known when the last actual use of these cards and checks bearing the old logo will occur. In addition, a billboard at Hawthorne race track displays the original MB logo. The billboard is maintained free of charge and Bank has not attempted to replace it. Further, a piece of engraved glass bearing the original MB logo is permanently affixed at one of Bank's branches; Bank may close that branch. Also, a

number of Internet databases reveal the original MB logo, purportedly because those databases have not yet been updated; some annual reports containing the original logo have been distributed to third parties, generally for the purpose of providing background about the banks that merged to form Bank; and, finally, Bank sells leftover merchandise containing the original MB logo via its intranet, which is accessible by Bank employees, only.

With respect to Bank's use of the MB and MB FINANCIAL word marks, Bank continues to use them to some extent. For instance, Bank has many branch locations that display Bank's "MB" word mark alone. In addition, Bank uses the MB and MB FINANCIAL word marks within the names of various subsidiaries and divisions (e.g., MB DEFERRED EXCHANGE CORPORATION, MB FINANCIAL INSURANCE).

### *Bank's business activities*

Bank is a national banking association with its principal place of business in Chicago, Illinois. Bank is a subsidiary of MB Financial, Inc. It offers an array of commercial and personal banking services, including services which pertain to real estate, as well as trust, investment, and insurance services. With respect to its real estate-related services, Bank serves as trustee for various personal trusts and estates, provides services for a number of land trusts (approximately 10-20% of which relate to commercial property), and offers Section 1031 tax-deferred exchange services through one of its subsidiaries. As a trustee of a land trust, Bank does not make day-to-day decisions on whether to lease or sell, how to manage, or how to invest the trust property. As an intermediary in connection with Section 1031 tax-deferred exchanges, Bank's subsidiary opened and completed approximately 8-10 such exchanges in the

year preceding the preliminary injunction hearing. In serving in this role, Bank's subsidiary does not act as a real estate broker, identify properties to be acquired, or assist customers in determining what the property to be acquired is "like." Bank also provides financing for real estate developments, as well as advice to its customers in connection with this financing, including conducting site visits and studying zoning issues. In addition, Bank is occasionally called upon to foreclose real estate in connection with its provision of real estate financing. Finally, Bank also provides investment and advisory services that often relate to real estate and investing in real estate.

Bank is not involved in managing commercial properties for others, representing commercial tenants in lease negotiations, or acting as a court appointed receiver in foreclosure actions filed by Bank.

## II.    Real Estate's History, Trademarks, and Business Activities

### *Real Estate's history*

Real Estate is also the product of a merger. Real Estate's predecessor, a real estate advisory and service firm called "Miglin-Beitler, Inc.," was founded by Lee Miglin and Paul Beitler in Chicago. At the same time Miglin-Beitler was doing business, Howard and Edward Milstein were operating a real estate business with operations primarily in New York. The Milstein brothers' New York commercial real estate operations were called "Douglas-Elliman Commercial." In April 1998, Howard Milstein acquired a 50% interest in Miglin-Beitler, Inc. and Miglin-Beitler, Inc. was renamed "Douglas-Elliman Beitler." In late 2000, the Milstein family decided to build a national commercial real estate company operating under one name. They initially chose the

name "MB Real Estate" -- the "MB" standing for Milstein Brothers -- and ran an advertisement announcing the new name in a number of publications in New York, Cleveland, and Chicago, including an edition of *Crain's Chicago Business* in January 2001. When the ad ran, however, Paul Beitler objected to using the name "MB Real Estate" in the Chicago market, although not in any of the other markets. Accordingly, the Milstein family changed the name of its Chicago operations to "MB Beitler." Shortly thereafter, on February 5, 2001, an advertisement ran in *Crain's Chicago Business* announcing the change in name from "Douglas Elliman-Beitler" to "MB Beitler." In logo form, the name appeared as "MBBEITLER," with no space between the MB and the Beitler. In non-logo form, the name appeared as "MB Beitler," with a space between the MB and the Beitler.

In June 2001, the Milstein family acquired Paul Beitler's interest in MB Beitler. Next, in January 2002, the Milstein family changed the company's name from "MB Beitler" to "MB Real Estate, LLC" to conform with the company's national name. This most recent name change and new logo were advertised in several publications, including the January 21, 2002 edition of *Crain's Chicago Business*. These advertisements, beginning on January 21, 2002, marked the first use of Real Estate's new logo and word mark in the Chicago area. Real Estate did not perform a trademark search before adopting its logo in January 2002.

No logos or word marks other than the "MB Real Estate" logo and word mark are currently used by Real Estate. Real Estate now operates under a single name in multiple states.

### *Real Estate's allegedly infringing trademark*

The mark presently used by Real Estate since January 2002 consists of the capital letters "MB," with the words "Real Estate" set to the right of "MB." The letters "MB" are displayed in the color blue, and the words "Real Estate" are displayed in the color black.

In promoting its business, Real Estate displays its name and logo throughout the buildings it owns or manages -- on directional signs, plaques at building entrances, informational signs, and in elevator cabs. Real Estate also displays its trademark on the uniforms worn by its employees. Use of outdoor signage bearing Real Estate's name and logo is presently limited to construction barricades surrounding two properties that it manages, and placards in the windows of six properties announcing that there is space for lease in those buildings.

### *Real Estate's business activities*

Real Estate is a Delaware limited liability company with its principal place of business in Chicago, Illinois. Real Estate is engaged in the commercial real estate business. It is a licensed real estate broker, as are many of its associates. Its commercial real estate business consists of property management, leasing, and corporate services such as tenant representation.

More specifically, Real Estate serves as the property manager of 22 commercial buildings in the Chicagoland area. Real Estate's property management and leasing clients consist of large institutions, private and state pension funds, major pension fund advisors and governmental entities. Real Estate also represents business tenants looking to renew their leases or execute new leases in commercial properties. Real

Estate's leasing transactions range from very small (e.g., 500 square feet) to very large (e.g., tens of thousands of square feet). In promoting its tenant representation services, Real Estate has a team of individuals who make cold calls to the Chicago area business community. Real Estate's cold callers may tell potential customers that the owners of Real Estate have substantial business in banking and insurance. Real Estate's Corporate Profile similarly informs readers that Real Estate's owners have "substantial interests in banking, insurance, real estate and sports franchises."

Real Estate also provides financial analyses to its clients in conjunction with its commercial development services, including market and financial analyses, land acquisition, zoning, financing, design, construction, marketing and disposition. Real Estate does not provide banking services, although, according to its Chairman, its services should be viewed as akin to a money manager's services. Real Estate does not engage in lending, and it is not a financer, equity source or mortgage broker. While Real Estate has provided services relating to Section 1031 exchanges of real estate, it has not done so since mid-2000, and presently does not hold itself out as having that capability.

## LEGAL ANALYSIS

A party seeking a preliminary injunction must demonstrate a likelihood of prevailing on the merits and must show that denial of preliminary relief will result in irreparable harm for which there is no adequate remedy at law. *Porsche Cars North Am., Inc. v. Manny's Porshop, Inc.*, 972 F. Supp. 1128, 1130 (N.D. Ill. 1997). "If the court is satisfied that these three conditions have been met, then it must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted,

balancing such harm against the irreparable harm the moving party will suffer if relief is denied." *Ty, Inc. v. The Jones Group,* 237 F.3d 891, 895 (7th Cir. 2001). The balancing involves a "sliding scale" analysis--the more likely it is that the movant will succeed on the merits, the less the balance of irreparable harms need weigh in its favor; the less likely the movant will succeed on the merits, the more the balance of irreparable harms need weigh in its favor. *Porsche,* 972 F. Supp. at 1130. The balancing process also takes into consideration the consequences to the public interest of granting or denying preliminary relief. *Id.; see also Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 461 (7th Cir. 2000);

## I.      Likelihood of Success on the Merits

To succeed on the merits in a trademark infringement claim, Bank must show that: (1) its mark is protected under the Lanham Act, and (2) there is a substantial likelihood of confusion between the asserted and allegedly infringing marks. *Barbecue Marx, Inc. v. 551 Ogden Inc.,* 235 F.3d 1041, 1043 (7th Cir. 2000).

In this suit, Bank asserts ownership and infringement of six marks, namely, the original MB logo, the "MB" word mark, the "MB FINANCIAL" word mark, and the newest "mb" logo, "mb financial bank" logo, and "MB Financial Bank" word mark. Real Estate challenges several of these marks as abandoned or otherwise not protectible. Therefore, before a "likelihood of confusion" analysis can be done, we must determine which marks can be asserted by Bank against Real Estate. We will address the protectibility of each of Bank's asserted marks, beginning with the newest marks.

## A.  Bank's protectible marks

While federal registration of a mark provides a mark with certain advantages, including the presumption of validity of the mark [*see*, 15 U.S.C. § 1115(a); *CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 673 (7th Cir. 2001)], a mark need not be registered to be protected under the Lanham Act. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). Instead, a mark is also protectible under the Lanham Act once it is used in commerce. 15 U.S.C. §§ 1125(a), 1127. *See also Sands, Taylor & Wood Co. v. The Quaker Oats Co.*, 978 F.2d 947, 954-55 (7th Cir. 1992); 2 McCarthy on Trademarks and Unfair Competition § 16:1 (2003) (stating that the way to obtain rights in a service mark is to actually use it as a mark).

### 1.  Bank's new marks

Bank used the latest of its asserted marks (the "MB Financial Bank" word mark, the "mb" logo, and the "mb financial bank" logo) for the first time in approximately October 2001. This first use predates Real Estate's first use of its allegedly infringing marks (the "MB Real Estate" logo and word mark) by at least two months, as Real Estate did not begin using its marks in the Chicago area until January 21, 2002.[2] Thus, Bank's use of these new marks, as well as its older asserted marks, predate Real Estate's first use of its allegedly infringing marks for purposes of protection under the

---

[2]     The *Crain's Chicago Business* advertisement which ran on January 20, 2001 of the prior year, wherein the "MB Real Estate" logo and word mark were used, does not establish rights in such marks in the Chicago area. This is because Real Estate expressly abandoned the marks in favor of the "MB Beitler" logo and word mark used in the February 5, 2001 advertisement pursuant to Paul Beitler's wishes. Moreover, the single use of a mark in an advertisement without any services offered under that mark does not constitute "use in commerce" under the Lanham Act. *See* 15 U.S.C. § 1127.

-14-

Lanham Act, making Bank the senior user of all of its asserted marks in the Chicago area. Although Bank is the senior user of all six of its asserted marks, Real Estate, as mentioned, challenges two of these marks, namely, the "MB FINANCIAL" word mark and the original MB logo.

## 2. The "MB FINANCIAL" word mark (the '873 Mark)

Bank claims that it owns '873 mark for the term "MB FINANCIAL" which was registered on July 10, 2001. The applicant for this mark was Manufacturers Bank.

Real Estate asserts two arguments as to why Bank does not own this mark. First, it argues there is no evidence that Manufacturers Bank assigned or transferred ownership of the '873 mark to Bank when Manufacturers Bank's charter ended. Second, Real Estate argues that the owner of the mark, Manufacturers Bank, never used it. Specifically, only Manufacturers Bank's parent company, MB Financial, Inc., used the mark, and there was no license between Manufacturers Bank and its parent for use of the mark.

A person cannot use a mark owned by another without a license agreement detailing the quality of the goods or services to be offered under the mark. *See, AmCan Enter., Inc. v. Renzi*, 32 F.3d 233, 235 (7th Cir. 1994). However, a written license agreement is unnecessary when the mark at issue is being used by a parent and its subsidiary and the necessary quality controls are in place to avoid causing harm to the public. *See* 2 McCarthy on Trademarks and Unfair Competition § 18:51.

Here, both Bank and its parent, MB Financial, Inc. use the mark at issue and have a stake in the quality behind the mark. Bank published a memo on its intranet informing employees how to begin using the new marks and how to dispose of the old

-15-

mark. We find this to be sufficient quality control over the use of the marks in this case, rendering a written license agreement between Bank and its parent company unnecessary. Thus, we find that Bank can assert the "MB FINANCIAL" word mark.

### 3. The Original MB logo (the '663 Mark)

Real Estate argues that Bank's original MB logo has been abandoned. To show abandonment of a mark, the party claiming abandonment must show that the mark's use has been discontinued with the intent not to resume such use. 15 U.S.C. § 1127; *Sands, Taylor & Wood*, 978 F.2d at 955.

### a. Intent to abandon

We will address whether Bank intended to abandon the mark, first. Intent to abandon a mark, or lack of intent to use a mark, can be shown through objective evidence. *See, Hiland Potato Chip Co. v. Culbro Snack Foods, Inc.*, 720 F.2d 981, 983 (8th Cir. 1983). An announcement that a mark will not be used in the future is strong evidence of an intent to abandon a mark. *Id.* Real Estate argues that Bank made such announcement when, at the time of the merger, Bank posted a memo on its intranet outlining the adoption of the new marks which featured the lower case letters "mb." The memo instructed employees to remove all items from sight which contained the original MB logo, to refrain from wearing clothing bearing the original MB logo to work, to shred all materials containing the old MB logo, and to take home all office supplies and accessories containing the old logo. At about the same time, Bank posted a similar memo on its intranet entitled "Out With The Old, In With The New," in which the original MB logo was shown being removed, and the new "mb financial bank" logo was shown being installed. Bank also sent a letter to its customers entitled "A New Era in Banking!"

which explained the advantages of the merger between Manufacturers Bank and Mid-City Bank and introduced the customers to Bank's new name and logo. On the cover of this letter, the original MB logo and the Mid-City Bank logo were shown in close proximity above the title of the document, with the new "mb financial bank" logo shown underneath.

Although falling short of explicitly stating an intent to abandon the original MB logo, the evidence clearly shows, in our view, that Bank's new logos were intended to represent Bank's new identity caused by the merger, and that the original MB logo was not to be used in connection with Bank's services any longer.

b.    *Actual abandonment*

As mentioned above, in addition to showing an intent to abandon, Real Estate must also show that Bank actually abandoned the mark. To avoid a finding of abandonment, a mark's use must be bona fide under the Lanham Act. 15 U.S.C. § 1127. The Lanham Act explains that a service mark shall be deemed to be in "use in commerce" when it is "used or displayed in the sale or advertising of services and the services are rendered in commerce...." 15 U.S.C. § 1127. Residual use, such as token use, use by sale of the remaining inventory containing the mark, or use merely to prevent others from using the mark, are not bona fide uses under the Lanham Act. *See, Emergency One, Inc. v. American Fireeagle Ltd.*, 228 F.3d 531, 536 (4th Cir. 2000); *Del-Rain Corp. v. Pelonis USA, Ltd.*, 2002 WL 133754, at *2 (2d Cir. 2002).

Real Estate argues that Bank actually abandoned the original MB logo because Bank has not used the original MB logo in advertising since November 2001, the original MB logo does not appear on any outdoor signs at any of Bank's branches, and all ATM

cards, debit cards, checks, and monthly statements which have been issued since the merger bear Bank's new name and logo rather than the original MB logo.

However, as noted previously, the original MB logo has not disappeared completely. All checks, ATM cards, and debit cards issued prior to the merger still bear the original MB logo, and none of these items have an expiration date. Bank replaces them with cards or checks bearing the new logo only as they are lost or damaged, and Bank has no plans to recall or actively replace any of these items. Bank argues that the original MB logo could be used in thousands, if not millions, of future consumer transactions for this reason. The original MB logo also appears on a piece of engraved glass at one of Bank's branches, on a billboard near Hawthorne race track, on an Internet search engine website, and in Bank's holding company's 2001 annual report.

The question then becomes: do these uses constitute bona fide uses under the Lanham Act? Real Estate argues that they are only residual uses and therefore not bona fide. In support of its contention, Real Estate argues that the piece of engraved glass bearing the old logo has not been removed only because Bank did not want to incur the expense of removing it since that branch may soon close; the advertisement at the racetrack is maintained free of charge and Bank does not wish to pay to remove it; and the Internet search engine website containing the old logo has not yet been updated. In *Intrawest Fin. Corp. v. Western Nat'l Bank*, 610 F. Supp. 950 (D.C. Col. 1985), a case cited by Real Estate, a bank holding company and its subsidiaries underwent a name change following a merger. *Id.* at 951-52. A corporate identity task force was created to facilitate the name change process, which included planning a major advertising campaign and coordinating the transition to new bank forms, new

-18-

stationery, new customer checks, new customer bank cards, new signs, and new building names. *Id.* at 952. The bank made public announcements about its name change and spent two million dollars in one month advertising its name change. *Id.* at 954. Afterwards, the bank's use of its old mark was "very limited," did not begin until several months after the name change, and related only to safe deposit box services. *Id.* at 954, 958. The court held that the bank abandoned its old mark because the bank's conduct caused the mark "to lose its significance as an indication of origin." *Id.* at 958. The court also characterized the bank's use of the old mark as "a sham use." *Id.* In finding the mark abandoned, the court stated that a mark must serve as an "identifier" in order for its use to be considered bona fide. *Id.* at 959. A mark used in a limited capacity for the purpose of maintaining the protectibility of the mark does not perform an identification function. *Id.* Although this case has many factual similarities to the case at hand, the court in *Intrawest* did not address one important factor, namely, whether there was any consumer use of materials containing the old mark which had been left in consumers' hands prior to the name change, as exists here.

Bank cites *First Nationwide Bank v. Nationwide Sav. And Loan Ass'n*, 682 F. Supp 965 (E.D. Ark. 1988) in support of its argument that its current use of the original MB logo is bona fide. In *First Nationwide Bank*, the court found that even though the plaintiff bank had changed its name, the bank's old name was still entitled to trademark protection because, among other things, consumers were "still exposed to plaintiff's 1st Nationwide Savings name, e.g. on passbooks, mortgage documents, certificates of deposit." *Id.* at 976. The court relied on this evidence to bolster its finding that the plaintiff still had protectible residual goodwill in its previous name and that the old mark

had not been abandoned. *Id.* at 979. Bank relies on *First Nationwide Bank* to bolster its argument that a mark is not abandoned if its residual goodwill is still retained in the mark. The concept that goodwill is built up within a mark is one of the main tenants upon which trademark law is based. *See generally CAE, Inc.*, 267 F.3d at 672; 2 McCarthy § 2:15. A mark becomes protectible upon use because goodwill generally accumulates in a mark through a mark's use in commerce. *See generally* 2 McCarthy §§ 2:15. It is the goodwill behind the mark that the Lanham Act protects. *Id.* Once the goodwill in a mark has disappeared by non-use of the businesses symbolized by the mark, the mark is no longer protectible because there is no goodwill left to protect. *See* 2 McCarthy § 17:14.

Here, Bank conducted an extensive advertising campaign to promote its new marks after the merger, when Manufacturers Bank ceased to exist. Whatever goodwill existed in the original MB logo was likely meant to be transferred to Bank's new marks. In our view, though, that transition left little goodwill in the original MB logo. As such, we find that the residual use of the original MB logo does not constitute a bona fide use under the Lanham Act.[3]

However, whether a use is bona fide is not, by itself, determinative of whether a mark has been abandoned. Marks continue to be protectible even after their use has ceased where the owner continues to use the "key element" of the mark. *Sands, Taylor*

---

[3] A practical problem arises, as well, if we find that Bank's residual use in this case is a bona fide use in commerce. Succinctly, when does this residual use cease? The number of checks, ATM cards or debit cards in circulation which bear the old marks will constantly drop over time; but when, exactly, should such residual use be deemed abandonment? We do not believe that an old logo, for which Bank has shown an intent to abandon, should be protected indefinitely. Nor do we believe that an old logo should be protected through residual use when there has been a showing of an intent to abandon the old logo and a new logo has been explicitly adopted in its place.

& *Wood*, 978 F.2d at 955. "'Minor changes in a mark which do not change the basic, overall commercial impression created on buyers will not constitute any abandonment.' So long as the owner continues use of the 'key element' of the registered mark, courts generally will not find abandonment." *Id.* (internal citations omitted); *see also* 2 McCarthy § 17:26.[4] Bank argues that the key element in its marks is the combination of the letters "mb," and because this key element is present in Bank's latest three marks, the old marks have not been abandoned.

It is undisputed that Bank uses the letters "mb" in its latest three marks. However, the commercial impression of the mark does not necessarily carry over just because the letters "mb" carry over. Here, the letters "MB" changed from capitalized, block letters, with the "M" directly aligned with the "B," to lower-case letters which are separated. The colors of the letters and their backgrounds also changed. In fact, the only thing that carried over from the old marks to the new marks was the combination of the letters "mb." We think such changes caused the basic commercial impression of the mark to change. Moreover, Bank has offered no evidence of a continuing commercial impression between the old marks and the new marks. As such, we find that Bank's latest marks fail to carry a continuing commercial impression from the original MB logo.

---

[4]     This rule is similar to the "tacking" rule applied in determining the priority of a mark. *See Navistar Int'l Transp. Corp. v. Freightliner Corp.*, No. 96 C 6922, 1998 WL 911776, at *2 (N.D. Ill. 1998). "Tacking" refers to a mechanism under the law that allows a junior mark to obtain an earlier priority date from a previously used mark. *Id.* Under the tacking rule, the junior mark must carry a continuing commercial impression from the previously used marks to obtain the benefit of the previous mark's priority date. *Id.* "The 'commercial impression' of a trademark is the 'meaning' or 'idea' it conveys, or the 'mental reaction' it evokes." *Id.* at *3 n.5. Bank cites several tacking cases where minor changes to the name of a product or company was held not to have broken the continuity of the commercial impression. However, we find these cases to be of no bearing here, as priority of the marks is not at issue in this case since all of Bank's asserted marks were used in commerce <u>prior</u> to Real Estate's first bona fide use of its "MB Real Estate" mark in the Chicago area.

Finally, Bank contends that the original MB logo is also protectible based on the residual goodwill that may be carried by a mark even after the mark has ceased being used. *See, Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club,* 34 F.3d 410, 413-14 (7th Cir. 1994). However, as stated previously, we find the residual goodwill in the original logo to be minimal. As Bank points out, a great deal of time, effort, and money was expended to promote the new "mb" marks. Whatever goodwill was built up in the old marks is now, in our view, carried primarily by the new marks due to such promotion efforts. The consumers who are exposed to the old marks most often know that these marks no longer represent Bank; they see the new logos on each monthly bank statement and outside each bank branch. In short, the steps taken by Bank to promote its new marks eliminated any goodwill or identification function previously served by the old marks. Thus, no common law protectibility remains with respect to the original MB logo.

In summary, we find that Bank intended to abandon the original MB logo and actually did abandon the logo, as its residual use of the original MB logo fails to constitute bona fide use under the Lanham Act, and the original MB logo has no continuing commercial impression with Bank's new marks or any common law protectibility based on residual goodwill. As such, the original MB logo has been abandoned.

### 4.    Family of marks

Bank initially claimed that all of the marks asserted in this lawsuit constituted a protectible family of marks. The family's common characteristic must have secondary meaning before the group of marks will be classified as a family. *AM General Corp. v.*

-22-

*DaimlerChrysler Corp.*, 311 F.3d 796, 814 (7th Cir. 2002). In this case, no evidence of any secondary meaning in the letters "MB" has been shown. Thus, we find that the marks asserted by Bank do not constitute a protectible family of marks.

### 5. Exclusive ownership of "MB"

Conversely, Real Estate argues that Bank cannot protect the letters "MB" in any of its marks unless they have acquired secondary meaning. Real Estate relies on *FS Servs., Inc. v. Custom Farm Servs., Inc.*, 471 F.2d 671, 673-74 (7th Cir. 1972) in support of its argument. The court in *FS Servs.* found that the letters "FS" had come to signify "farm services" or "farm supply" – terms that were descriptive or generic. *Id.* at 674. Descriptive terms must have secondary meaning to be protectible. *See, G. Heileman Brewing Co., Inc. v. Anheuser-Busch, Inc.*, 873 F.2d 985, 993 (7th Cir. 1989) (citing *FS Servs.*, 471 F.2d at 674); *Chicago Reader, Inc. v. Metro College Pub. Co.*, 711 F.2d 801, 802 (7th Cir. 1983). The letters "MB" in Bank's marks are derived from the names Manufacturers Bank and Mid-City Bank and therefore are not descriptive. Thus, Bank's marks (since they all contain the letters "MB") do not require secondary meaning in order to be protectible.

### 6. Summary

Based on the foregoing analysis, we find that Bank may assert the following marks: the new "mb" logo, "mb financial bank" logo, and "MB Financial Bank" word mark, the "MB FINANCIAL" word mark (the '873 mark), and the "MB" word mark. We find that Bank has abandoned the original MB logo (the '663 mark). The following analysis as to the likelihood of confusion is based upon Bank's assertable marks, only.

-23-

**B.    Likelihood of confusion**

Courts in the Seventh Circuit apply a seven-factored test to determine whether a likelihood of confusion exists between two trademarks. *Smith Fiberglass Prods., Inc. v. Ameron, Inc.*, 7 F.3d 1327, 1329 (7th Cir. 1993). Specifically, courts examine: (1) the degree of similarity between the marks; (2) the similarity of the products or services for which the marks are used; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the complainant's marks; (6) actual confusion; and (7) an intent on the part of the alleged infringer to palm off its products as those of another. *Id; Barbecue Marx, Inc.*, 235 F.3d at 1043-44. We will address each of these factors in turn.

*1.    The degree of similarity between the parties' marks*

In addressing the similarity of the marks, we begin by focusing on the dominant portions of the parties' marks, in this case, the letters "MB." *See,* 3 McCarthy on Trademarks and Unfair Competition §23:42 (2003) ("It is appropriate ... to give greater weight to the important or 'dominant' parts of a composite mark, for it is that which may make the greatest impression on the ordinary buyer"); *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1116 (7th Cir. 1997) ("A person hearing the two parties' names would likely focus on the word 'Meridian' and gloss over the other words, and the parties are therefore using essentially the same mark"). However, our analysis is not limited to just the letters "MB" in the parties' marks. *See Basic Am. Med., Inc. v. American Med. Int'l, Inc.*, 649 F. Supp. 885, 891 (S.D. Ind. 1986) ("the question of likelihood of confusion entails consideration of the entire marks, where and how those marks are used and whether or not there are other distinguishing aspects, such as

-24-

accompanying logos"); *Barbecue Marx*, 235 F.3d at 1044 ( When "the public will encounter the marks in written as well as spoken form ... it is essential to consider the marks' visual characteristics"); *AM General Corp.*, 311 F.3d at 825 (stating that "[l]imiting the focus to the grille and ignoring all that surrounds the grille seems to blink the general rule that courts evaluate similarity in light of what happens in the marketplace"); *Henri's Food Prods. Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 355 (7th Cir. 1983) (examining the trademarks as a whole to determine whether the marks are similar and stating that it is important to examine similarity of the marks' "sound, sight, and meaning"); *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 644 (7th Cir. 2001) (holding that even though the parties used the exact same words in their marks, "the words' appearances do not resemble each other and are not likely to cause confusion").

Bank argues that the letters "MB" in the original MB logo are virtually identical to the letters in Real Estate's logo, and argues that the court should focus its analysis on these letters as they are the dominant portions of both parties' marks. Bank further argues that the Court should not focus its analysis on the small details of the parties' logos because both parties' marks are used aurally, and the only trademark that will stand out in this context are the letters "MB." Bank contends that the parties' use of the words "financial bank" or "real estate" along with the letters "MB" does not reduce the similarity between the parties' marks.

Real Estate, not surprisingly, asserts that the parties' marks are very distinct. Real Estate compares its mark to Bank's latest marks, asserting that Bank does not use the original MB logo and therefore cannot focus on it. In contrast to Bank, Real Estate focuses on the details in the parties' marks and asserts that the only common feature

between the "MB Real Estate" mark and the "mb financial bank" mark are the letters "M" and "B," as both the styles and the colors of the marks are different. Real Estate points out that the "mb" in Bank's mark are lower case and in the color white, whereas the "MB" in Real Estate's mark are capitalized and in the color blue. In addition, the letters in Bank's mark are all lower case, whereas the letters in Real Estate's mark are lower case and capitalized. Moreover, the "M" and the "B" in Bank's mark are centered in a bright red box, whereas there is no corresponding box in Real Estate's mark. According to Real Estate, the words "financial bank" included in Bank's mark differentiate the parties' marks even further, as those words are also different in style and color (as well as meaning) from the words "Real Estate." Finally, Real Estate asserts that there is also a distinct aural difference between "mb financial bank" and "MB Real Estate."

After reviewing the parties' arguments on this issue, we conclude that this factor favors Real Estate. As a preliminary matter, we focused on Bank's newest marks as opposed to the original MB logo in comparing the marks, because, as discussed above, we found the original MB logo to have been abandoned. In comparing Bank's newest marks to Real Estate's mark, we agree with Real Estate that the only real similarity is the combination of the letters "MB," and those letters were presented in a visually distinct manner. The color schemes and styles of the marks are different. And, the words "Real Estate" and "financial" or "financial bank" placed beside the letters "MB" make the marks even more different. Based on these differences, we think the parties' customers will have no difficulty differentiating between the services offered. We are not persuaded by Bank's argument that the marks are similar because they are used aurally, as we think persons engaged in conversations where these marks are spoken

would know whether a bank or a real estate company was being discussed; and, as for the cold calling operation, we think consumers will hear the words "Real Estate" along with the letters "MB," and derive meaning from those words. Moreover, as Bank itself points out, Real Estate's mark is viewed on a regular basis, whether inside the buildings it manages or owns, such as the METRA station, or on temporary outdoor signage. Thus, the aural use of the marks here is not enough to tilt this factor in favor of Bank. Accordingly, we find that this factor weighs in Real Estate's favor.

    2.   *The similarity of the products or services for which the marks are used*

Another factor to be addressed in determining the likelihood of confusion is the similarity of the services for which the marks are used. Bank contends that the parties' services are very similar. As discussed above, Bank argues that it engages in real estate-related services by providing banking services to owners, developers, and tenants of real estate, and by engaging in real estate-related trust services,[5] real estate financing, real estate loan enforcement, and investment and advisory services concerning real estate services. Bank further argues that Real Estate engages in businesses that are similar to Bank's, such as providing financial analyses to clients and holding itself out as offering such services.[6] Finally, Bank points out that there has been a significant expansion in the services provided by financial services firms such as Bank

---

[5]    Bank argues that although it may not have a large portfolio of commercial properties in the trusts and estates it manages, as Real Estate does, its customers know that it provides these services.

[6]    Real Estate's chairman testified that Real Estate's services should be viewed as akin to a money manager's services, and its Corporate Profile informs readers that its owners have "substantial interests in banking ...."

due to the deregulation of the financial services industry. According to Bank, this deregulation makes the parties' services even more similar.

Real Estate, in response, argues that the services for which the parties' marks are used are very dissimilar. It argues that it manages and leases commercial buildings and represents companies seeking to negotiate commercial leases, whereas Bank does not. According to Real Estate, Bank's real estate-related business is limited to loaning money, and Bank is legally prohibited from engaging in the types of services provided by Real Estate. Real Estate further argues that Bank has not demonstrated that, in the minds of consumers, the services offered by both are closely related. "'Closely related' products are those that 'would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner.'" *CAE, Inc.*, 267 F.3d at 679 (quotation omitted). According to Real Estate, consumers are well aware that a real estate company is not a bank and that a bank is not a real estate company. No reasonable consumer would try to cash a check at Real Estate, and no reasonable consumer would ask a bank to manage a building or represent the consumer in a lease negotiation.

Real Estate relies on several cases in support of its contentions. In one such case, *First Western Fed. Sav. Bank v. The First Western Bank Strugis,* 636 N.W.2d 454, 458 (S.D. 2001), the court found no likelihood of confusion between two banks which used the term "First Western" in their names, since one of the banks was "primarily a real estate lending operation, a federal savings and loan," and the other offered more generalized banking services. 636 N.W.2d at 458. In another case, *Northern Trust Corp. v. Northern Bank & Trust Co.*, No. 89-3052-T, 1991 WL 346397

-28-

(D. Mass. 1991), the court found that consumers would not likely confuse the parties' use of "Northern Trust" and "Northern Bank & Trust" because the plaintiff's banking services were more sophisticated than the defendant's banking services and thus "substantively distinguishable." 1991 WL 346397, at *2. Real Estate argues that its position is even stronger because Bank and Real Estate are not competitors.

While we note that there are slight similarities in the parties' services, we find their services to be, for the most part, completely different. Bank is engaged in the business of banking, and Real Estate is engaged in the business of real estate. The services offered by Bank as examples of its "real estate-related services" are not, in our view, similar to the types of services provided by Real Estate. Our opinion on this issue is bolstered by the fact that Bank is legally prohibited from engaging in real estate brokerage, one of Real Estate's primary businesses. *See, American Ins. Ass'n v. Clarke*, 656 F. Supp. 404, 407 (D.D.C. 1987) (stating that banks and their subsidiaries "may exercise only those powers either expressly conferred by the National Bank Act or those 'incidental powers . . . necessary to carry on the business of banking'"). Nor do we think the public will view the parties' services as similar. Real Estate's argument that a consumer is not likely to walk into Real Estate to cash a check, or into Bank to have a lease negotiated, is well founded. As such, this factor weighs in favor of Real Estate.

3.    *The area and manner of concurrent use*

With respect to this third factor, Bank contends that the area of concurrent use of the parties' marks is similar, as there is significant overlap in Bank's and Real Estate's customer base and potential customer base. Bank asserts that many of its current customers are clients of Real Estate or tenants in properties owned and/or managed by

Real Estate. In addition, Bank asserts that the parties target the same customer base. Real Estate has targeted at least 150 of Bank's current customers, and both parties target middle market companies. Moreover, Real Estate personnel interact with their tenants on a daily basis, and Bank believes these interactions may be attributed to Bank.

Bank argues that the manner of concurrent use of the parties' marks is also similar, as the parties use many of the same channels to market their products. Bank asserts that both parties send direct mail announcements to a similar group of professionals, use indoor and outdoor signage to promote their services, and maintain an internet site describing their services. The parties also advertise in some of the same publications. For instance, they have both advertised in *Real Estate Chicago*, and the October 2002 edition contained an article which referred to Real Estate solely as "MB." Real Estate sent copies of this article to its customers as a marketing piece.

Real Estate argues that the area and manner of concurrent use by the parties is very different. As for the area of concurrent use, Real Estate asserts that only five of Bank's customers (open or closed) have been tenants in buildings managed by Real Estate since January 2001. As for the manner of concurrent use, Real Estate acknowledges that there is some overlap in the parties' marketing channels (*e.g.*, the use of direct mail and internet sites), but argues that the primary marketing tools used by the parties are different. Real Estate's outdoor signage is generally limited to temporary barricade signage, whereas Bank displays outdoor signage permanently outside its branch locations. While Real Estate concedes the parties' logos have

appeared in the same publications, it contends that this overlap has been limited to just a few occasions.

We agree with Bank that several of the parties' marketing channels are similar (*e.g.*, direct mail, internet sites, and business magazines), although we do not find this fact to be determinative of this issue here, as thousands of companies use these general marketing channels to promote their services. We agree with Real Estate that the parties' use of signage to promote their services is different. Real Estate generally relies on indoor signage to promote its name, whereas Bank uses outdoor signage. On the other hand, we find that the potential customer bases of the parties is sufficiently overlapping, and that the parties advertise in many of the same real estate-related publications, as well as promote themselves on the same corner of Madison and LaSalle in Chicago. Based on these findings, we conclude that this factor, although close, weighs in favor of Bank.

### 4. The degree of care likely to be exercised by consumers

The degree of care likely to be exercised by consumers is determined by considering several factors, including the expense of the product and the sophistication of the purchasers. *Unelko Corp. v. Kafko Int'l, Ltd.*, No. 90 C 6650, 1992 WL 44842, at *3 (N.D. Ill. 1992). *See also Planet Hollywood*, 80 F. Supp. 2d at 882 ("Where consumers are sophisticated, deliberate buyers, confusion is less likely than where the consumers are prone to make uninformed, impulse purchases"); *Maxim's Ltd. v. Badonsky*, 772 F.2d 388, 393 (7th Cir. 1985) (where the cost of the defendant's product is high, "courts assume that purchasers are likely to be more discriminating than they might otherwise be").

The parties focus their arguments on the sophistication of the consumers, and agree that their consumers are sophisticated. Bank, however, argues that this sophistication will only lead to more confusion in this case, as its consumers will be aware of the continuing diversification of the financial services industry and will assume that either Bank is engaging in real estate services or Real Estate is engaging in banking services. *See, Morningside Group Ltd. v. Morningside Capital Group, L.L.C.,* 182 F.3d 133, 143 (2d Cir. 1999) (stating that market sophistication might in some circumstances increase the likelihood of confusion). Bank also argues that its customers already know it manages property in trusts and estates, and, as such, will associate Bank with Real Estate when encountering Real Estate's property management services.

Real Estate argues that Bank is turning the sophistication argument on its head, and without any evidentiary support. It contends that if Bank's hypothetical customer has this level of sophistication, he or she will surely know that Real Estate is not a bank, and vice versa.

We are more persuaded by Real Estate's argument here, and conclude that the sophisticated consumers of Bank's and Real Estate's services will be aware that Real Estate is not engaged in the business of banking. As for Bank's less sophisticated customers, who may already know that Bank engages in the management of property in trusts and estates, we do not see how this will affect the degree of care exercised by these customers, as they will also know they can continue to obtain these services from Bank. As such, we find that this factor weighs in favor of Real Estate.

5.    *The strength of the complainant's marks*

The strength or weakness of a mark "depends in part upon third-party use of

marks similar or identical to plaintiff's." *Navistar,* 1998 WL 911776, at *8.  *See also*

*Anheuser-Busch, Inc. v. A-B Distrib., Inc.*, 910 F. Supp. 587, 593 (M.D. Fla. 1995) ("A

strong trademark is one that is rarely used by parties other than the owner of the

trademark, and thus is closely associated with the owner of the mark"); *M-F-G Corp. v.*

*Emra Corp.*, 626 F. Supp. 699, 703 (N.D. Ill. 1985) ("Trademarks are also considered

weak if they are used on a variety of other products by other companies.").

Bank argues that its mark is strong.  In support of this contention, Bank argues

that an arbitrary arrangement of letters such as "MB" qualifies for trademark protection

as an arbitrary or fanciful trademark, which is the strongest of all trademarks.  *See, EA*

*Eng'g, Sci. & Tech., Inc. v. Environmental Audit, Inc.*, 703 F. Supp. 853, 856 (C.D. Cal.

1989).  Bank acknowledges that many third-party trademark registrations and telephone

directory listings contain the letters "MB" (which would seem to negate the strength of its

marks),[7] but argues that, without evidence these trademarks were actually used by third

parties, well promoted, or recognized by consumers, Real Estate has failed to

---

[7]    The following businesses are listed in 2001-2002 Chicagoland area telephone books:  MB Realty & Investment; MB Builders; MB Concrete Inc.; MB Inc.; MB Global Inc.; M & B Properties Inc.; MB Electric; MB Fleming Plumbing Inc.; M & B Enterprises; MB Roofing; MB Public Supplies; M & B Landscaping; MB Upholstery; MB Midwest; M & B Management; MB Music Production; MB Sales; M-B Group Ltd.; MB Thomas; MB Jewelers; M-B Sales; MB Cleaners; MB Automotive; MBD Financial Corp.; MB Ruff Inc.; MB Personnel & Screening Inc.; MBNA Marketing; MBK Financial Services; MB Partners Systems; M & B Construction Inc.; M & B Communications; and MB Properties.  The following federal trademarks incorporate the letters MB for banking or financial-related services: MBNA; MBNY MERCHANTS BANK OF NEW YORK; MB RISK MANAGEMENT (& Design); MB CERTIFIED APPRAISALS & Design; MB ADVANTAGE THE ADVANTAGE IS ALL YOURS (& Design); MB (& Design); MBSAVINGS; MBCU & Design; MBANX; and MBCA MILTARY BENEFITS CENTERS OF AMERICA & Design.

demonstrate any weakness in Bank's marks. *See, CAE, Inc.*, 267 F.3d at 685 (affirming conclusion that plaintiff's mark was strong where there was no evidence that third parties' marks were actually used, well-promoted, or recognized by consumers). Bank also notes that at least four of Real Estate's witnesses were unable to identify any other Chicago companies using the letters "MB" alone in their name, and cites the testimony of Real Estate's Chairman, who stated that a short name like MB is a powerful trademark. Finally, as for Real Estate's argument that Monigle advised Bank not to use initials in its new name, Bank responds that Monigle never tested the strength of the initials MB.

Real Estate argues that Bank's mark is weak due to the widespread use of the letters "MB." According to Real Estate, phone books in the Chicago area list numerous businesses which use the letters "M" and "B" in their names, many of which appear to relate to financial or real estate businesses. A trademark search also demonstrates extensive use of the letters "MB," including use by banks or financial institutions. And, numerous registered Internet sites use the letters "MB," including approximately nine of which relate to financial services (*e.g.*, www.mbbank.com). Real Estate argues that the absence of secondary meaning in the letters "mb," the suggestion by Monigle that use of initials in Bank's name would make a weak mark, and the addition of the generic terms "financial" and "bank" to the letters "mb" further underscore the weakness of Bank's mark.

The number of times the letters "MB" appear in registered trademarks, internet sites, and phone books shows us that third-party use of marks similar to Bank's is abundant. Moreover, it appears to us that a great number of these businesses engage

in financial or real estate-related services (*e.g.*, MB Realty & Investment; M & B Properties Inc.; MBD Financial Corp.; MBK Financial Services; M & B Construction Inc.; and MB Properties); and a number of the trademarks pertain to financial services. However, as Bank points out, Real Estate did not provide sufficient evidence to establish that these trademarks were used by third parties, well promoted, or recognized by consumers. Moreover, an arbitrary arrangement of letters such as MB is the strongest of all trademarks, and Bank has spent a great deal of money advertising its services under this trademark. Thus, although we find this factor to be a close call, we ultimately conclude that Bank's mark is strong.

      6.   *Actual Confusion*

      Another factor to be considered in determining whether there is a likelihood of confusion is whether there is any evidence of actual consumer confusion. "Confusion, in the legal sense means confusion of source." *Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.*, 626 F.2d 193, 195 (1st Cir. 1980) (citations omitted). Evidence of actual confusion, "if available, is entitled to substantial weight." *Meridian*, 128 F.3d at 1118 (quotation omitted). A plaintiff need show only that individuals were confused, not that they actually retained the wrong company's services. *See, Promatek Ind., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 812 (7th Cir. 2002).

      Bank argues that the court should consider actual confusion as to affiliation between the parties. Bank argues that it has produced evidence of actual confusion on this issue through testimony of sophisticated parties in the real estate and financial services industries who were allegedly confused into believing the parties were affiliated. All of these persons were confused into believing the parties were affiliated in

2002 – after Bank had begun using its latest marks. These persons included: Kurt Kunkel, a Vice President at LaSalle Bank with 18 years of experience in banking; William Shrank, a former CFO of Prime Group (a real estate development and investment company); Roger Zamparo, a customer of Bank and also a real estate attorney and owner of two title companies; Nancy Hamilton, a Bank employee; and James Gow, Treasurer for Carl Buddig & Company and an alleged client prospect of Bank. Because many of these witnesses are not end-user customers, Bank argues that the court should consider actual confusion that has arisen among segments of the population as opposed to simply end-user customers.

Real Estate argues that all of the comments relied upon were made without business implication. Kunkel's statement was not made in furtherance of doing business with Bank, as he was a social acquaintance of Bank employee Nancy Hamilton and not a customer or potential customer of Bank. Similarly, Shrank's statement was made at a birthday barbecue, to a neighbor of his who worked at Bank, and had nothing to do with an attempt to conduct or not conduct business with Bank. Shrank is also not a customer of Bank. Gow testified that Carl Buddig is neither a customer nor potential customer of Bank. And, Zamparo is a vendor of Bank who had called to solicit work.

Generally, to establish actual confusion, a plaintiff should provide evidence that a person or corporation mistakenly purchased defendant's product or services while intending to purchase plaintiff's product or services. *Telemed Corp. v. Tel-Med, Inc.*, 588 F.2d 213, 220 (7th Cir. 1978). *See also Lang v. Retirement Living Publ'g Co., Inc.*, 949 F.2d 576, 582-83 (2d Cir. 1991) ("relevant confusion is that which affects 'the purchasing and selling of the goods or services in question'"); *Packman*, 267 F.3d at

-36-

645 (holding that phone calls from family and friends whose confusion did not pertain to the source of defendants' product was not evidence of actual confusion); *CAE, Inc.*, 267 F.3d at 686 (discounting testimony about alleged confusion of a supplier since he was not a customer).

In this case, Bank offered no evidence that any consumer had ever approached it to obtain services from Real Estate, or that any consumer had ever approached Real Estate to obtain banking services. Bank also failed to offer any evidence of consumers mistaking Bank as the source of services which they received from Real Estate, or vice versa. In fact, Zamparo was the only Bank customer called by Bank to testify. Bank did, however, present testimony from numerous witnesses as to their confusion regarding the parties' affiliation, and presented testimony from a Bank employee who had an appointment with an unidentified person who mistakenly entered an "MB Realty" office instead (which arguably could constitute confusion as to source, although was not, in our view, here). Unfortunately, we do not believe that this is enough in this case. In our view, Bank needed to provide *some* evidence that a consumer was confused as to the source of the parties' services, rather than just as to the parties' affiliation. As such, we find that this factor also weighs in favor of Real Estate.

>    7.    *Intent by the defendant to palm off its products as that of the plaintiff's.*

The last factor to consider is the defendant's intent in adopting its trademark. Bank argues that because Real Estate adopted its MB trademark without conducting a search beforehand, this factor favors Bank. Bank further argues that even if we find there not to have been any bad intent by Real Estate, this factor should not weigh in

favor of Real Estate; it should only make the factor neutral to the likelihood of confusion analysis. *See, e.g., Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 287 (6th Cir. 1997) (stating that "*lack* of intent by a defendant is 'largely irrelevant in determining if consumers likely will be confused as to source'").

Real Estate argues that a finding of intent under this factor requires a determination that it intentionally appropriated Bank's goodwill for its own use [*see, Planet Hollywood*, 80 F. Supp. 2d at 884]; but that Bank has offered no such evidence.

Given Real Estate's history with respect to its ownership by the "Milstein brothers" and its previous name "Miglin-Beitler," we do not believe Real Estate's failure to have conducted a trademark search in this case constitutes evidence of a bad intent by Real Estate. As such, this factor weighs in favor of Real Estate, although it will be considered neutral in the likelihood of confusion analysis.

*Summary*

While Bank has shown that the area and manner of concurrent use between the parties' marks is overlapping and that its mark is strong, it has failed to establish the remaining five factors in the likelihood of confusion analysis. Although Bank did not need to establish all seven factors, Bank needed to establish more than just these two factors to show a substantial likelihood of confusion, in our view. As such, we find that Bank has not established a substantial likelihood of confusion, and therefore has not shown that it has a likelihood of prevailing on the merits. Because we make such a finding, we need not consider whether denial of preliminary relief will result in irreparable harm for which there is no adequate remedy at law or any of the remaining factors.

However, because we find the likelihood of confusion analysis to be close, we will consider these factors briefly.

## II.     Inadequate Remedy at Law and Irreparable Harm

In cases of trademark infringement, where a likelihood of success has been established, an inadequate remedy at law and irreparable harm from the loss of customer goodwill is nearly always presumed. *See, e.g.*, Porsche, 972 F. Supp. at 1132 ("The Seventh Circuit has found that damages caused by trademark infringement and dilution are by their very nature irreparable and are not susceptible to a remedy at law.") (citing *International Kennel*, 846 F.2d at 1092); *Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1026 (7th Cir. 1979) (the "readiness to find irreparable injury" in trademark cases arises from the courts' realization "that the most corrosive and irreparable harm attributable to trademark infringers is the inability of the victim to control the nature and quality of the defendant's goods").

While irreparable harm is generally presumed in such cases, that presumption is overcome where the plaintiff delays in seeking injunctive relief, and a court may infer from this delay that there is no threat of irreparable harm. *Ohio Art Co. v. Lewis Galoob Toys, Inc.*, 799 F. Supp. 870, 887 (N.D. Ill. 1992). *See also Borden*, 1984 WL 1458, at *17 (no irreparable harm where plaintiff delayed six months in bringing suit); *Stokely-Van Camp Inc. v. Coca-Cola Co.*, No. 86 C 6159, 1987 WL 6300, at *3 (N.D. Ill., Jan. 30, 1987) (finding balance of harms tipped in defendant's favor and denying preliminary injunctive relief to plaintiff who waited three months to bring suit after knowledge of the defendant's use of a similar mark); *but see Ty, Inc.*, 237 F.3d at 902-3 (affirming

preliminary injunction where plaintiff waited eight months to seek injunctive relief); *Ideal Industries*, 612 F.2d at 1025 (preliminary injunction not precluded where plaintiffs waited seven months to file suit and eight months thereafter to move for preliminary injunction).

Bank contends that it will suffer irreparable harm because it is a bank and must therefore project high standards of integrity, confidentiality and reliability, as well as protect its reputation. It believes its customers may be reluctant to provide confidential information to it because its customers may think it is affiliated with Real Estate. Bank argues that Real Estate's telemarketing activities are particularly damaging to its ability to manage its reputation, as many find such marketing tool to be offensive. As for Real Estate's argument that Bank delayed in bringing suit, which decreases its irreparable harm, Bank asserts that Real Estate was well aware of Bank's intentions with respect to its claims. Bank sent a cease and desist demand shortly after Real Estate began using its new mark in the Chicagoland area, and subsequently engaged in settlement discussions with Real Estate before bringing suit. Thus, Bank asserts, Real Estate did not "act in reliance" on Bank's delay.

Real Estate, as mentioned, argues that Bank's delay in bringing this motion negates its claim of irreparable injury. Real Estate asserts that, not only did Bank wait eight to nine months[8] to bring the motion for a preliminary injunction after Real Estate adopted its mark in January 2002, but Bank was aware of Real Estate's use of the letters "MB" for even longer – since May 2001 when representatives of MB Beitler met

---

[8] After Real Estate adopted its mark in January 2002, Bank sent a cease and demand letter to Real Estate. The parties' attorneys discussed the issue in April 2002. Bank filed its complaint in August 2002, and its motion for preliminary injunction on October 8, 2002.

with representatives of Manufacturers Bank and Mid-City National Bank of Chicago to offer their services.[9] This was before Bank even adopted its new "mb" logos and word mark. Thus, argues Real Estate, before Bank even chose the name "MB Financial Bank," it was aware of another company going by the name of "MB Beitler." Next, Real Estate argues that if a preliminary injunction is issued against it, it will suffer irreparable harm, as it has been using the MB Real Estate name for over one year in Chicago and over two years nationally. Real Estate has spent money advertising its name and posting signage in buildings in which it does business, although, the Court notes, not nearly as much as Bank has spent promoting its new marks.

We conclude that there is no adequate remedy at law if Bank is denied its motion for a preliminary injunction in this case. However, we do not believe that Bank has established that it will suffer irreparable harm if a preliminary injunction is denied. As we mentioned previously, although irreparable harm is generally presumed in trademark infringement cases, that presumption is overcome where the plaintiff delays in seeking injunctive relief because a court may infer that there is no threat of irreparable harm. In this case, we find that Bank's delay of approximately nine months in bringing suit, combined with its notice of Real Estate's use of the similar name "MB Beitler" during the previous year, negates any inference of irreparable harm. While we understand Bank's argument that it needs to manage its reputation, we are not

---

[9]     At the meeting, the MB Beitler representatives passed out their business cards, which included the "MB Beitler" name and logo. Shortly thereafter, a representative of MB Beitler sent a letter to Manufacturers Bank on letterhead which included the name and logo "MB Beitler."

convinced that Bank's customers will be reluctant to provide confidential information to it, simply because of some presumed relationship with Real Estate.

## III.    Balance of Harms/Public Interest

Bank argues that the balance of the harms weigh in its favor, as it has been investing in its "family" of MB trademarks for over five years, and its trademarks represent a multi-million dollar investment over that period as well as Bank's goodwill. Bank argues that Real Estate, in contrast, has been using its mark since only January 2002 and its overall investment is not great in comparison with Bank's investment.[10] Moreover, Real Estate does not engage in much advertising, which further minimizes the cost that would be required to change its name. Finally, Bank argues, Real Estate's name is not that well known, as one of Real Estate's cold calling employees testified that only 5-10% of its targets have ever heard of Real Estate. As for the public's interest, Bank argues that the public's interest would be well served by an injunction, as an injunction would protect consumers from confusion. *Eli Lilly*, 233 F.3d at 469; *Logan Graphic Prods., Inc.*, 2002 WL 31870549, at *9 (N.D. Ill. 2002).

Real Estate argues that it has been branding its name in several states since January 2001 -- for approximately two years and before Bank ever used the name "mb financial bank." It also states that it has spent money advertising its name and posting signage at buildings, and has built goodwill among its customers. Moreover, Real Estate notes that it is finally using a name that is consistent with its operations in other states. For all of these reasons, Real Estate claims that <u>it</u> will suffer irreparable injury,

---

[10]    Real Estate has changed its name three times in as many years at a cost of $150,000 per change and did not identify any specific problems that it experienced due to its name change.

and that it would be wholly inequitable to enjoin it from using its mark now, after Bank waited so long to bring the suit. As for the public's interest, Real Estate acknowledges that the public has the right not to be deceived or confused, but states that the public's interest also includes free competition, low prices and an absence of monopolies. Real Estate argues that regardless of whether the parties are direct competitors, "the effect of a preliminary injunction would be to prevent competition" (citing *Alltel Corp. v. Actel Integrated Comm. Inc.,* 42 F. Supp. 2d 1265, 1274 (S.D. Ala. 1999)). Real Estate further states that it is not in the public's interest to allow Bank to control a line of business, *i.e.,* real estate, which is unrelated to its actual business of banking.

We find that both the balance of harms and the public interest favor denying Bank's request for a preliminary injunction. While it is in the public's interest not to be confused or deceived, we did not find there to be a substantial likelihood of a confusion between the parties' marks in this case. Thus, it is not necessary to enjoin Real Estate from using the mark simply to protect the public from being confused. Similarly, we find that Real Estate would suffer more harm than Bank would suffer if the preliminary injunction were issued. As mentioned above, Real Estate has been using the "MB" name in areas outside of Chicago for some time, and finally has a uniform name for all of its operations. Moreover, Real Estate put Bank on notice of the "MB" name, in conjunction with the word Beitler, before Bank adopted its most recent marks. Although Real Estate has not spent a great deal of money advertising its mark, it has built goodwill in it. As such, we find that these factors also favor Real Estate.

## CONCLUSION

For the above reasons, we recommend that the District Court DENY Bank's request for a preliminary injunction. Specific written objections to this report and recommendation may be served and filed within 10 business days from the date that this order is served. Fed. R. Civ. P. 72(a). Failure to file objections with the District Court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the report and recommendation. *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).[11]

ENTER:

MICHAEL T. MASON
**United States Magistrate Judge**

**Dated: June 20, 2003**

---

[11] As for Bank's Unfair Competition and Deceptive Business and Trade Practices claims, neither party spent any time at the hearing or in their briefs addressing these issues. Since we recommend that an injunction not be issued on Bank's trademark infringement claim, we also find that no injunction need be issued with respect to any of Bank's other claims.

-44-